IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JILL C. WILLIAMS, | ) | CASE NO. 3:18CV324 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES G. CARR |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jill Williams ("Williams") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

On July 24, 2014, Williams protectively filed applications for DIB and SSI, alleging a

disability onset date of September 1, 2012.  Tr. 21, 739.  She alleged disability based on the

following: COPD, rheumatoid arthritis, diabetes, hypothyroidism, chronic high blood pressure,

major depression, bi-polar, irritable bowel syndrome, and diverticulitis.  Tr. 743.  After denials

by the state agency initially (Tr. 584, 585) and on reconsideration (Tr. 614, 615), Williams

requested an administrative hearing.  Tr. 641.  A hearing was held before an Administrative Law

Judge ("ALJ") on January 5, 2017.  Tr. 517-551.  In his February 1, 2017, decision (Tr. 12-24),

the ALJ determined that there are jobs that exist in the national economy that Williams can

perform, i.e., she is not disabled.  Tr. 22.  The Appeals Council denied Williams' request for

review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.  Personal and Vocational Evidence

Williams was born in 1960 and was 51 years old on her alleged onset date.  Tr. 739.  She

has four years of college and had vocational training.  Tr. 525-526.  She last worked regularly in

2012 as a machine operator.  Tr. 527, 529.

### B.  Relevant Medical Evidence

In February 2013, Williams went to the emergency room complaining of mild shortness

of breath for two days, having worsened after having experienced it for 6-7 months.  Tr. 1005.

She also complained of a cough, wheezing, chest discomfort and foot swelling.  Tr. 1005.  She

reported having had no recent medical care.  Tr. 1005.  She smoked a pack of cigarettes a day.

Tr. 1008.  Upon exam, she had scattered, faint wheezing and was in no respiratory distress.  Tr.

1005.  The impression was acute bronchitis and exacerbation of COPD and she was given an

inhaler.  Tr. 1006.  The emergency room provider gave Williams a note stating she could return

to work two days later with no restrictions.  Tr. 1016.

In September 2013, Williams went to the emergency room complaining of swelling in her

left foot and pain, rated 7/10, that she had experienced intermittently over the last several months

but which had become worse the last two days.  Tr. 1133-1134.  She denied respiratory and

cardiovascular symptoms.  Tr. 1134.  Upon exam, she had normal cardiovascular and pulmonary

findings, displayed a normal mood and affect, and had tenderness and swelling in her left foot

and ankle.  Tr. 1135.  X-rays revealed some soft tissue swelling but no evidence of fracture or dislocation.  Tr. 1136.  The impression was a sprain or strain and she was discharged with an ACE bandage and prednisone and instructed to follow up with her primary care physician.  Tr. 1136-1137.

A pulmonary function study scheduled a few weeks later was not performed because Williams reported difficulty breathing.  Tr. 801-804.  She successfully underwent a pulmonary function study in October 2013 and gave maximum effort.  Tr. 809-814.  The interpreting physician stated that the test resulted in non-reproducible tracings and was not valid; he also concluded that the test showed a moderate obstruction.  Tr. 812.

On December 19, 2013, Williams went to the emergency room complaining of dizziness, shortness of breath, lightheadedness, and facial swelling.  Tr. 820.  Her symptoms were mild and ongoing and had worsened in the past week.  Tr. 820.  She also complained of upper abdominal pain, pressure in her chest, and a slight cough.  Tr. 820.  Her past medical history included sleep apnea, hypertension, diabetes, rheumatoid arthritis, hypothyroidism, irritable bowel syndrome, and diverticulitis.  Tr. 820.  She smoked less than one pack of cigarettes a day, drank more than 5 units of caffeine, and smoked marijuana a few times a week.  Tr. 821.  Upon exam, she was in no distress and had normal cardiovascular, pulmonary, gastrointestinal, neurological, and mental findings, including a normal EKG.  Tr. 821-822.  She had swelling in her eyelids and legs.  Tr. 821.  She was admitted after a blood test showed severe TSH elevation; she was discharged two days later with a principal diagnosis of symptomatic hypothyroidism and myxedema (swelling of skin due to hypothyroidism).  Tr. 836.  She admitted she had not taken her diabetes or thyroid medications in months, saying she had no money.  Tr. 947.  She also stated that nobody told her it was so important to take her medication.  Tr. 842.  Her discharge note read that she has a long

3

history of medical noncompliance and it was explained to her how important it was she stay on

her medication, which cost $4 a month.  Tr. 836.  A social worker commented that Williams

claimed to not be able to afford her medication but she could still afford to smoke.  Tr. 955.

During her stay she also complained of generalized joint aches consistent with arthritis, stated

that her thyroid medication was helping, and that her "thinking/memory seems to be improving."

Tr. 938.  She was advised upon discharge to follow up with various providers.  Tr. 837.

On September 10, 2014, Williams went to the Gene Wright Community Health Center

(GWHC) and saw licensed professional clinical counselor Cody Cramer for behavioral health

treatment.  Tr. 1032-1033.  She reported having seen a doctor of psychiatry for the past 20 years

but had to stop because she didn't have insurance and couldn't afford it.  Tr. 1032.  She

complained of being anxious and depressed, having irritability and difficulty sleeping, using

tobacco and marijuana, and having attention and concentration problems for years.  Tr. 1033.

Upon exam, she had clear speech, logical thought processes, normal thought content,

questionable judgment, normal insight, a labile mood, and a flat affect.  Tr. 1033.  Cramer

assessed bipolar disorder and cannabis abuse and recommended getting Williams' records from

her prior psychiatrist and possibly restarting on medications that she had previously been

prescribed.  Tr. 1034-1035.

Also at GWHC that day, Williams saw certified nurse practitioner Jessica Dailey to start

care for her thyroid condition and complaints of back or kidney pain.  Tr. 1036.  Upon exam, she

was in no acute distress, her pulmonary, cardiovascular, neurological and gastrointestinal

findings were normal, and she displayed a normal gait, intact judgment and insight, and a normal

mood.  Tr. 1038-1039.  She was assessed with COPD, diabetes, hypothyroidism, and a urinary

tract infection.  Tr. 1040.  She was prescribed medications and advised to improve her diet and

get 30 minutes of physical activity 5 times per week.  Tr. 1041.

Williams followed up with Nurse Dailey on October 6, 2014.  Tr. 1042-1044.  She reported back pain that was moderate and sharp, and urinary symptoms that were improved by pain medication.  Tr. 1042.  She had no additional complaints.  Tr. 1042.  Dailey ordered a renal ultrasound, Tr. 1045, which was normal, Tr. 1046.  In November she had a CT scan, which showed a renal lesion.  Tr. 1070.

On December 15, Williams saw Anil Muddada, M.D., for evaluation of her renal lesion and blood in her urine.  Tr. 1070.  She denied a history of kidney stones, stated that she had had a renal cyst on her right kidney for several years, and said she had used Advil, a NSAID, for almost 20 years for arthritis.  Tr. 1070.  She denied depression and respiratory problems and complained of joint pain.  Tr. 1072.  Upon exam, her pulmonary and cardiovascular findings were normal and she had no musculoskeletal swelling or tenderness.  Tr. 1072.  Dr. Muddada assessed chronic kidney disease stage II (most likely secondary to longstanding hypertension, diabetes and NSAID use) and advised Williams to minimize NSAID use and that she may need to try tramadol instead.  Tr. 1074.

On December 17, Williams saw another nurse practitioner at GWHC and complained of body aches and extreme shoulder pain that she thought was fibromyalgia.  Tr. 1084.  She denied cardiovascular, respiratory, and gastrointestinal symptoms.  Tr. 1086.  A physical exam was normal.  Tr. 1087.

On December 22, Williams saw chiropractor Donald Riepenhoff at GWHC for complaints of shoulder, neck, knee, middle back, and rib pain that started 10 or 25 years prior and which she rated a 9 out of 10.  Tr. 1090.  Her pain was alleviated by NSAIDs and heat.  Tr. 1090.  She advised that she used to see a chiropractor; the treatments helped; and the last time

she saw one was in 1989.  Tr. 1090.  Upon exam, her extremities and ribs were normal and she

had moderate muscle spasms, tenderness to palpation, and reduced range of motion in her spine.

Tr. 1090.  Dr. Riepenhoff provided chiropractic treatment over the next two months, during

which time Williams rated her pain between a 5 and 9 out of 10 with similar exam findings.  Tr.

1098-1111, 1119-2211.

At a follow-up at GWHC on December 24, 2014, for COPD, Williams denied complaints

and the provider spent the majority of the visit counseling her on inhaler technique, self-

management of the disease, identification of triggers, and reviewing various treatment options

and adherence.  Tr. 1094.  Williams' medications were adjusted and she was encouraged to stop

smoking, improve her diet, and get 30 minutes of physical activity 5 times per week.  Tr. 1097.

On January 7, 2015, Williams saw podiatrist Heather Gray, D.P.M., for a diabetic foot

evaluation and reported pain in both feet for a few years, particularly her left ankle and a bunion

on her right foot.  Tr. 1166-1168.  She reported that she was advised a few years ago that she had

a cyst on her left ankle that was pressing on the nerve and it was getting worse.  Tr. 1166.  Upon

exam, she had 2 masses on top of her left ankle that she had had for 3-4 years that were tender to

palpation.  Tr. 116, 1168.  Dr. Gray ordered an MRI of Williams' left ankle and, after viewing

the results showing significant tenosynovitis with a small tear in her anterior tibial tendon,

planned to perform surgery to repair the tear.  Tr. 1169-1173.

At a pre-operative physical with Nurse Dailey on February 3, Williams denied

cardiovascular and pulmonary symptoms and showed normal findings upon examination.  Tr.

1112-1115.  The same day she saw Cramer for behavioral health treatment and asked to restart

medication.  Tr. 1116.  Upon exam, she had a labile mood and normal affect, with clear speech,

logical thought processes, questionable judgment, and normal insight.  Tr. 1117.  Cramer advised

that they had not received Williams' prior records and that they should try to get the records before starting medication.  Tr. 1117.

On February 11, Williams attended a follow-up appointment for COPD, in which she reported no change in baseline symptoms since her last visit and that her symptoms were controlled by medication, although she still felt her breathing could improve.  Tr. 1123.  She was down to 5 cigarettes a day and her albuterol use was down from 4 times a day to 1.  Tr. 1123-1124.  The provider recommended Williams continue her medications and, if she did not improve further in 6 weeks, she could try another medication.  Tr. 1124.

Dr. Gray performed surgery on Williams' left foot on March 3 and by March 12, Williams was doing well with "no pain at all."  Tr. 1162-1165, 1184.  On April 2 she was feeling good, was wearing regular shoes, and reported "minimal pain."  Tr. 1190.

On April 14, Williams saw Nurse Dailey and reported that her kidney burned and she had pain and swelling in her right arm.  Tr. 1215.  She stated that she thought she had fibromyalgia because she had pain all over.  Tr. 1215.  She denied cardiovascular and pulmonary symptoms as well as anxiety and depression.  Tr. 1217.  Upon exam, her right arm was tender to palpation and had swelling; all other findings were normal.  Tr. 1217-1218.  Dailey ordered a right shoulder x-ray.  Tr. 1219.  The x-ray was negative.  Tr. 1213-1214.

On April 21, Williams returned to Nurse Dailey for an annual exam and for right shoulder pain.  Tr. 1229.  She denied cardiovascular, gastrointestinal, and respiratory symptoms, and denied joint pain, depression, and anxiety.  Tr. 1231.  Upon exam, she had tenderness and moderately restricted range of motion in her right shoulder.  Tr. 1232.  An MRI revealed a small partial-thickness bursal surface tear along the supraspinatus tendon insertion and findings consistent with bursitis and mild osteoarthritis.  Tr. 1208-1209.

On May 19, 2015, Williams saw licensed social worker Daphne Lindo at GWCH and asked to restart behavioral health medications, complaining of depression, anxiety and mood swings.  Tr. 1221.  She reported a history of bipolar disorder.  Tr. 1221.  Her prior medical records showed that she had been on Celexa and Lexipro, which had provided some benefit.  Tr. 1221.  Upon exam, she had clear speech, logical thought processes, normal thought content, normal judgment and insight, and an anxious mood with normal affect.  Tr. 1222.  The impression was unspecified episodic mood disorder and pain disorder.  Tr. 1223.  The same day, Williams had a COPD follow-up and reported that her breathing "was improving greatly until the humidity picked up and she is back to square one."  Tr. 1224.  Upon exam, her breathing was normal.  Tr. 1227.  She was prescribed additional controller inhalers.  Tr. 1225.

On June 2, Williams saw Lindo and complained of mood swings, difficulty sleeping, and chronic pain which she stated was from fibromyalgia.  Tr. 1241.  She was referred to a fibromyalgia clinic for behavioral health medications to be addressed there.  Tr. 1242.  Williams saw Nurse Dailey the same day and told her that her lungs were better since she cut back on smoking, but that vitamin D was not helping her fibromyalgia.  Tr. 1236.  A physical exam was normal.  Tr. 1237-1238.

On June 5, Williams had a colonoscopy which showed a polyp (which was removed by hot biopsy), hemorrhoids, and diverticulitis.  Tr. 1203-1206.  It was recommended she follow a high fiber and diverticular diet.  Tr. 1204.

On June 30, 2015, Williams continued to complain of COPD symptoms and did not feel that a new medication was helping.  Tr. 1244.  The provider stopped that medication and prescribed a different one.  Tr. 1244.

On July 6, 2015, Williams began seeing Obie Ramsay, M.D., for her complaints of fibromyalgia. Tr. 1296. Dr. Ramsay discussed the chronic nature of fibromyalgia and noted that the most effective treatment was stretching and daily exercise including warm water exercises and classes. Tr. 1296. Dr. Ramsay also assessed chronic hand pain due to osteoarthritis and discussed gentle exercises, paraffin wax bath, and staying active. Tr. 1297. Upon exam, Williams had tender trigger points across her shoulders, upper arms, chest wall, and legs, as well as muscle spasms and tightness. Tr. 1298. Hand x-rays showed no erosive or proliferative arthropathy. Tr. 1313-1314.

At a follow-up on July 24, Dr. Ramsay assessed rheumatoid arthritis, fibromyalgia, and depression. Tr. 1293. Upon exam, Williams had tender trigger points across her shoulders, upper arms, chest wall, and legs, with muscle spasms, tightness, and a slightly decreased hand grip. Tr. 1295. She was started on amitriptyline for depression. Tr. 1294.

On August 5, Williams saw Dr. Muddada for a follow up of her chronic kidney disease and said she felt well with no complaints. Tr. 1535. Her chronic conditions of kidney disease, diabetes, and high blood pressure were well controlled with medication. Tr. 1535. Her exam findings were normal. Tr. 1538. On August 12, Williams told Nurse Dailey that she was down to three to four cigarettes per day and said she felt better. Tr. 1348. She reported sometimes having leg cramps that lasted all day and denied cardiovascular, pulmonary, and gastrointestinal symptoms, as well as restricted motion, anxiety, and depression. Tr. 1349. Her exam findings were normal. Tr. 1349.

On September 23, Williams attended a follow up for COPD. Tr. 1353. She was down to 3 cigarettes a day and a physical examination contained normal respiratory findings. Tr. 1354, 1356.

On September 4, 2015, Williams followed up with Dr. Ramsay.  Tr. 1289.  She said her hands were slightly improved but she reported morning stiffness and achiness all over.  Tr. 1290.  She was not stretching or exercising.  Tr. 1290.  Dr. Ramsay increased her amitriptyline for depression.  Tr. 1290.  She had tender trigger points across her shoulders, upper arms, chest wall, and legs, with muscle spasms, tightness, and a normal hand grip.  Tr. 1291.

On October 29, Williams went to the emergency room for right shoulder pain.  Tr. 1261-1270.  Her arm felt warm and ibuprofen had not been helping.  Tr. 1261.  Upon exam, her right shoulder had a decreased range of motion and tenderness; otherwise she had normal findings, including strength, sensation, and muscle tone.  Tr. 1264.  X-rays were normal.  Tr. 1265.  She received a sling and pain medication.  Tr. 1265.

On November 9, Williams saw Dr. Ramsey and reported no big improvement on medication for her rheumatoid arthritis.  Tr. 1286-1287.  Upon exam, she had decreased hand grip and decreased range of motion in her shoulders.  Tr. 1288.

On January 6, 2016, Williams saw Cramer for a follow-up behavioral health visit.  Tr. 1363.  She described her symptoms as mild and said they tended to remain fairly stable during the day.  Tr. 1363.  Upon exam, her mood was euthymic and she had a normal affect, thought process, insight and judgment.  Tr. 1363-1364.  The same day she saw Nurse Dailey for a check-up and for lumps on her legs and leg cramps and was doing "ok otherwise."  Tr. 1358.  An ultrasound showed lipoma in her legs, which Dailey advised could be removed "from whom[] did them before."  Tr. 1366.

On January 11, Williams saw Dr. Ramsey and reported symptoms including morning stiffness and achiness all over, including her hands and wrists.  Tr. 1283-1284.  She reported weakness, dizziness, fatigue, headaches, numbness, tingling, wheezing, shortness of breath on

exertion, swelling, nausea, diarrhea, constipation, muscle aches, joint pain, trouble walking, and decreased range of motion.  Tr. 1284-1285.  Upon exam, she had decreased hand grip and trigger points in her shoulders, upper back, upper arms, and knees, and synovitis in her hands.  Tr. 1285.

On April 26, 2016, Williams returned to Dr. Ramsey for a follow up.  Tr. 1282.  She was on Cimzia for her rheumatoid arthritis and was doing better; her stiffness had improved.  Tr. 1281.  Upon exam, she had tender trigger points across her shoulders, upper arms, chest wall, and legs, as well as muscle spasms and tightness.  Tr. 1282.  Her hands were normal.  Tr. 1282.  She again reported weakness, dizziness, fatigue, headaches, numbness, tingling, shortness of breath on exertion, swelling, nausea, diarrhea, constipation, muscle aches, joint pain, and trouble walking.  Tr. 1280-1281.

On March 8, Williams returned to Nurse Dailey complaining of pain in her legs, right hip, and back.  Tr. 1374.  Dailey adjusted her medications.  Tr. 1377.  On April 26, Williams complained to Dailey of chest pain.  Tr. 1383.  An exam contained normal respiratory and cardiovascular findings.  Tr. 1386.  Williams was to call Dr. Gardner for her complaints of chest pain and Dailey continued to advise improved diet and physical activity 30 minutes 5 times per week.  Tr. 1383, 1388.  The same day, Williams saw Cramer for behavioral health and appeared anxious and depressed.  Tr. 1389-1391.  She advised that she had "had an intake at Coleman" and Cramer strongly encouraged her to reestablish counseling and psychiatry at the Coleman clinic.  Tr. 1389-1390.

On May 4, Williams returned to Dr. Gray for a diabetic foot examination, reporting tingling and numbness in her feet.  Tr. 1345.  She had a callus on her right foot that caused her pain and no other concerns.  Tr. 1345.  Upon dermatologic exam of her lower extremities, she had normal reflexes and intact sensation, normal range of motion and normal strength.  Tr. 1347.

Dr. Gray advised that Williams wear diabetic shoes and instructed her on diabetic foot care.  Tr. 1347.

On June 16, 2016, Williams was seen for COPD triage at GWCH.  Tr. 1392.  She reported increased shortness of breath and mucus production for the past three weeks, which the provider remarked was indicative of a COPD exacerbation.  Tr. 1393.  She also complained of excessive depression and anxiety.  Tr. 1393.  A physical examination contained normal findings.  Tr. 1395-1396.  She was prescribed a course of antibiotics and a steroid taper.  Tr. 1396.  The same day, Williams saw Cramer for a behavioral health follow up.  Tr. 1398-1400.  She reported increased symptoms due to stressors.  Tr. 1398.  She stated that she no longer sees her prior psychiatrist because she owes him too much money and hasn't been back.  Tr. 1398.  Upon exam, she had clear speech, logical thought processes, normal thought content, normal insight, questionable judgment, an anxious and depressed mood, and a tearful affect.  Tr. 1399.

On June 23, Williams began receiving mental health treatment at the Coleman clinic upon referral from Nurse Dailey.  Tr. 1404.  She reported anxiety and depression and stated that she had been diagnosed with bipolar disorder when she was 20.  Tr. 1401, 1404.  She described prior suicide attempts, has had daily suicide thoughts "for a long time," and had no current plan or attempt.  Tr. 1404.  She reported two past hospitalizations.  Tr. 1404.

On July 23, Williams visited the Coleman clinic stating that she was "just really anxious and depressed.'  Tr. 1437.  She complained of anhedonia, variable sleep and appetite, decreased concentration and low energy.  Tr. 1437.  She endorsed having hypomanic symptoms often when she was young but she did not have these often now.  Tr. 1437.  She also described anxiety attacks which occurred suddenly and without warning: she becomes short of breath, her heart

starts pounding, and she sweats and shakes.  Tr. 1437.  She was started on Lamictal and Vistaril.  Tr. 1437.

On July 26, 2016, Williams was seen for COPD triage at GWCH and reported shortness of breath and excess mucus.  Tr. 1478-1479.  She stated that her condition had not improved since her prior visit in June and most days she felt like she was gasping for air just talking.  Tr. 1478-1479.  An examination contained normal respiratory and cardiovascular findings.  Tr. 1481-1482.  The provider stated that Williams would benefit from a chest x-ray and a pulmonary referral.  Tr. 1479.

On August 31, Williams saw Dr. Muddada for a follow-up for her kidney disease.  Tr. 1540-1451.  She felt well and denied any complaints.  Tr. 1547.  Dr. Muddada stated that Williams' GFR was slowly trending down, and she was at kidney disease stage III secondary to long-standing high blood pressure, diabetes, and chronic use of NSAID medications.  Tr. 1550.  She reported taking almost 24 tablets of ibuprofen a week and Dr. Muddada advised her to stop completely.  Tr. 1550-1551.  Her blood pressure was well controlled on medication and Dr. Muddada stated that her diabetes needed aggressive control.  Tr. 1551.

On October 14, Williams saw pulmonary specialist Marc S. Rovner, M.D., complaining of difficulty breathing, shortness of breath, sputum production, and wheezing.  Tr. 1559.  She stated that her problems were gradually worsening and were aggravated by any activity, weather change, climbing stairs, exposure to smoke and fumes, and reported moderate improvement on treatment.  Tr. 1559.  She was still smoking a few cigarettes per day.  Tr. 1559. Upon exam, she displayed normal breath sounds, no stridor, no respiratory distress, no wheezes, no rales, and no tenderness on pulmonary/chest inspection.  Tr. 1564.  Dr. Rovner opined that Williams' Pulmicort function tests "do not show much COPD if at all."  Tr. 1564.  He further stated that

one of her medications (Symbicort) does not work on active smokers and should be discontinued.  Tr. 1564.  He strongly encouraged her to stop smoking.  Tr. 1564.

On October 1, Williams had a session at the Coleman clinic and reported bad anxiety and stated that her depression was the same.  Tr. 1466.  Her Lamictal and Vistaril were increased.  Tr. 1471.  She was also taking trazadone and amitriptyline.  Tr. 1471.

### C. Opinion Evidence

#### 1. Physical therapist evaluation

On December 12, 2016, Williams saw physical therapist David Reed for a functional capacity evaluation at the request of Nurse Dailey.  Tr. 1565-1569.  On lift testing, Williams could not lift any weight from the floor or overhead due to pain and she demonstrated ability to rarely (due to shortness of breath) lift 10 pounds from the knee, waist, and shoulder levels and could push and pull 10 pounds.  Tr. 1565.  She could constantly sit, occasionally stand and walk, and could not kneel, squat, reach up, bend, climb stairs, climb ladders, or crawl.  Tr. 1565.  She could occasionally reach out and could frequently use her hands (although she could not do so repetitively due to shortness of breath).  Tr. 1565.  Reed recommended no repetitive tasks or activities due to shortness of breath.  Tr. 1566.  Her trunk and upper extremity range of motion was limited by 50% due to pain.  Tr. 1566.

#### 2. Treating source

On January 5, 2017, Dr. Ramsay completed a two-page medical statement form.  Tr. 1589-1590.  She opined that Williams had sero and rheumatoid arthritis, fibromyalgia, and osteoarthritis.  Tr. 1589.  She had moderate pain and at times could complete 2 hours of work without a break, but at other times would need a 10 minute break every hour.  Tr. 1589.  When asked how long Williams could work during a day and sit and stand at one time, Dr. Ramsay

14

stated that this was "unknown" because "FC did not address."[1]  Tr. 1589.  She circled answers
regarding lifting (rarely 10 pounds), postural (occasionally bend, stoop and balance), and
manipulative abilities (occasionally gross and rarely fine manipulation, occasionally reach arms),
stating "Per FC limited because of breathing."  Tr. 1589.  When asked about performing
repetitive hand motions for 18 minutes every hour, Dr. Ramsay wrote, "unknown unless FC
addressed."  Tr. 1589.  Williams would occasionally need to elevate her legs during an 8-hour
workday and when asked to specify how high (i.e., 6 inches from floor, waist/hip height, heart
height) Dr. Ramsay did not answer and stated that she did not understand the question.  Tr. 1589.
She opined that Williams would be off task 20% of the time, although she also stated, "unknown
for sure may have brain fog with fibro."  Tr. 1590.  Williams has good days and bad days, could
not complete an 8-hour workday, and Dr. Ramsay did not answer the question how often
Williams would be absent from work, stating "I do not determine disability."  Tr. 1590.

### 3. Consultative Examiner

On September 3, 2013, Williams saw Sushil Sethi, M.D., for a consultative examination.
Tr. 791-798.  Williams reported COPD symptoms and said she smoked a pack of cigarettes a
day, down from two packs a day.  Tr. 791.  She was currently on medication for diabetes (which
she said controlled it) and a thyroid condition.  Tr. 791-792.  She also relayed a history of
constipation and occasional pain in her lower abdomen and was told she might have
diverticulitis.  Tr. 791.  She had been treated for depression for many years and used marijuana
to relax.  Tr. 791.  Upon exam, she was in no acute distress and her breath sounds showed
occasional expiratory wheezes and rhonchi due to her smoking habit but no coarse crepitation or
bronchial breathing.  Tr. 792.  Her extremities were normal except for a non-tender cyst in her

---

[1]  As explained in the analysis section, *infra*, "FC" likely stands for "functional capacity" and refers to Reed's evaluation.

left ankle; she walked with a normal gait and had negative straight leg raise testing.  Tr. 792-793.

She had slightly reduced range of motion in her lumbar spine and knees and was normal in all

other tested joints.  Tr. 793, 796-798.  She had had an x-ray of her lumbar spine which showed

degenerative changes most prominent at the L5-S1 level.  Tr. 793, 794.  Dr. Sethi opined that, in

an 8-hour workday, Williams could sit for 8 hours, walk for 6 hours, stand for 6 hours, carry 30

to 35 pounds frequently, and carry 40 to 60 pounds occasionally.  Tr. 793.

On September 2, 2014, Williams saw psychologist Albert Virgil, Ph.D., for consultative

psychological examination.  Tr. 1022-1026.  She reported daily marijuana use and indicated she

had not received mental health treatment in the past three or four years due to lack of insurance.

Tr. 1023-1024.  She reported a depressed mood, displayed logical and coherent thought content,

showed sufficient attention and a freedom from distractibility, and had an intact memory and

adequate judgment.  Tr. 1024-1025.  Dr. Virgil opined that Williams was able to understand and

carry out instructions, demonstrated adequate attention and concentration, appeared amenable to

supervision and able to interact adequately with coworkers, and appeared mentally and

emotionally capable of responding appropriately to work demands and pressures.  Tr. 1026.

On October 8, 2014, Williams saw B.T. Onamusi, M.D., for a consultative physical

examination.  Tr. 1051-1060.  She stated that she had been diagnosed with rheumatoid arthritis

more than 20 years ago, diabetes, and COPD.  Tr. 1051.  Upon exam, she had a normal gait,

could grip and grasp with both hands and was able to use her hands for fine coordination and

manipulative tasks.  Tr. 1053.  She had normal range of motion in all joints and her spine, other

than limited extension and lateral flexion of her lumbar spine without tenderness.  Tr. 1053,

1057.  She had mild tenderness over her first metatarsophalangeal joints.  Tr. 1053.  Dr. Onamusi

opined that Williams could perform light work.  Tr. 1053.

### 4. State Agency Reviewers

On October 22, 2014, state agency reviewing psychologist Courtney Zeune, Psy.D.,

reviewed Williams' record and found that Williams' mental condition was not severe.  Tr. 577.

On January 22, 2015, state agency reviewing psychologist Kristen Haskins, Psy.D., agreed.  Tr.

607.

On October 14, 2014, state agency reviewing physician Gerald Klyop, M.D., reviewed

Williams' record and opined that Williams could occasionally lift and/or carry up to 50 pounds,

frequently lift and/or carry up to 25 pounds, stand and/or walk for about 6 hours, sit for about 6

hours, and must avoid concentrated exposure to extreme temperatures and pulmonary irritants.

Tr. 579-580.  On January 15, 2015, state agency reviewing physician Paul Morton, M.D., agreed.

Tr. 609-610.

### D.  Testimonial Evidence

#### 1.  Williams' Testimony

Williams was represented by counsel and testified at the administrative hearing.  Tr. 519,

524.  She lives in a house with her daughter and three grandchildren.  Tr. 524-525.  She does not

have a driver's license because it was suspended due to insurance "or something."  Tr. 525.  She

also stated that she hasn't been driving because she has early onset cataracts and can't see well at

night and, during the day, she is afraid that she might get a cramp somewhere.  Tr. 525.  Her

hands don't work right.  Tr. 525.

Williams testified that she could no longer perform her past job as a machine operator

because she could no longer carry the heavy boxes, which she was consistently required to do, or

go up and down three steps, which she had to do several times each shift.  Tr. 530-531.  The

boxes weighed about 50 pounds.  Tr. 531.  At work, she began to drop boxes and she had carpal

tunnel surgery.  Tr. 530.  Her shoulders also hurt; they had hurt for years and she thought it was part of her fibromyalgia.  Tr. 531.  She decided to take a buyout and leave work because she was on the verge of getting fired for "attendance and stuff."  Tr. 532.

Williams stated that she was currently prevented from working full time because she is not able to stand for more than 10 minutes without leaning on something or stopping to rest her back.  Tr. 532.  She lives one block from a city bus and after walking "the short end of one block" she has to lean against a tree and use her inhaler.  Tr. 532.  Her breathing problem is caused by her COPD.  Tr. 532.  If someone walks by wearing perfume it takes her breath away.  Tr. 532.  She smokes 2-3 cigarettes every day but she is trying to quit.  Tr. 532-533.  She used to smoke two packs a day.  Tr. 533.  It is hard for her to stop smoking because "everyone in my house smokes but the kids" and, if both her daughters are at her house smoking, she wants a cigarette.  Tr. 533.  She smokes marijuana also on rare occasions, a couple times a week.  Tr. 533, 534.  It helps her sleep and relaxes her muscles.  Tr. 533.  She acknowledged that smoking marijuana is inconsistent with having a lung impairment; that is why she has three inhalers.  Tr. 533.

In addition to COPD, Williams stated that she has fibromyalgia that keeps her from working.  Tr. 534.  It makes different muscles hurt, especially in her back.  Tr. 534.  She can't really stand.  Tr. 534.  She can't put any pressure on her upper back.  Tr. 534.  She also has arthritis; "It's so bad that I take injectables for it."  Tr. 534.  She has rheumatoid arthritis and also osteoarthritis in her knees.  Tr. 534.  "My knees, my elbows, my ankles and my back, I have a couple discs."  Tr. 534.  She receives treatment for her arthritis from Dr. Ramsay.  Tr. 534.  Her treatment consists of medication and stretching.  Tr. 534.  She was trying to do therapy but she was unable to "get up there."  Tr. 534-535.  She sees Dr. Ramsay every three months.  Tr. 535.

Williams also stated that she has restless leg syndrome and a lot of muscle cramps.  Tr. 536.  "As a matter of fact, my lawyer warned me [sic] a condition I didn't even know I had that causes severe muscle spasms."  Tr. Tr. 536.  The attorney stated that the condition is called rhabdomyolysis and he believed the record indicated it was "their connection to some of the problems she was having because of her kidney."  Tr. 536.

Williams also has problems with her hands.  Tr. 536.  Her knuckles swell and some days she can barely move them.  Tr. 536.  If she holds something for very long she gets a cramp in her hand.  Tr. 536.  As a result, she can barely read or do anything on the computer for more than maybe an hour, in total, per day.  Tr. 536.  She had surgery on both hands in 2009.  Tr. 536.  Her hands are giving her trouble again.  Tr. 537.  She can't make a fist or pick up a lot of heavy things.  Tr. 537.  When asked if her blood sugar is under control, Williams responded, "it's a little high once in awhile."  Tr. 537.  The symptoms she has from her diabetes are dizziness, dry skin, and numbness, tingling, and diabetic nerve pain in her feet.  Tr. 538.  She takes separate medication for that.  Tr. 538.  She also has arthritis in her toes.  Tr. 539.

As for her kidney issues, Williams explained that she used to take about 16 ibuprofen tablets a day and they found a mass on her kidney in an ultrasound.  Tr. 538.  The problems she has now with her kidney are that she was told to stop taking ibuprofen and she now has stage three kidney disease instead of stage two.  Tr. 538-539.  She has problems with irritable bowel syndrome; she either has constipation or diarrhea.  Tr. 539.  With diarrhea, which she experiences several times a month, she may be in the bathroom 7 or 8 times for 20 minutes at a time.  Tr. 539.  She also has diverticulitis and cannot eat a lot of foods that have seeds; if she does, it feels like someone is dragging a barbed wire through her.  Tr. 540.  She also has problems with both shoulders, which are getting worse with her fibromyalgia.  Tr. 540.  When

asked what Dr. Ramsay has said about her fibromyalgia, Williams stated that it's in multiple sites. Tr. 541. "The last time I seen [Dr. Ramsay], she wasn't sure if it was the fibromyalgia or the arthritis, but I do have severe pain from that." Tr. 541. Some days she is really tired and some of the medications make her dizzy. Tr. 541. She is off balance and has fallen three or four times in the last couple of months. Tr. 541.

Williams stated that she has had bipolar depression all her life. Tr. 541. She has been seeing someone on and off for about 40 years. Tr. 541. Treatment sometimes helps; sometimes it takes several months and she still had good days and bad days. Tr. 541. A good day is when you wake up not sick or dizzy and you don't feel as tired as you did when you went to bed. Tr. 542. She is supposed to get 10-12 hours of sleep a night for her fibromyalgia. Tr. 542. About 2-3 times a week she does not get up and stays in bed the whole day. Tr. 542. She wears her pajamas every day unless she has an appointment. Tr. 542. When asked about memory issues she described, Williams stated that they believe that is due to her medication because she takes a lot of medication that causes dizziness and drowsiness. Tr. 542. A bad day is when she takes her medication and an hour later "I'm like drunk. I get dizzy spells. I have to catch myself." Tr. 542. She does not think she could make it through an 8-hour workday. Tr. 543. The biggest reason she could not work is because of her fibromyalgia, although it is a tossup between that and arthritis. Tr. 544.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing. Tr. 545-549. The ALJ asked the VE to determine whether a hypothetical individual of Williams' age, education and work experience could perform Williams' past work or any other work if that person had the

limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could perform Williams' past work and other jobs in the national economy.  Tr. 546.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his February 1, 2017, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.  Tr. 14.

2.      The claimant has not engaged in substantial gainful activity since September 1, 2012, the alleged onset date.  Tr. 14.

3.      The claimant has the following severe impairments: chronic obstructive pulmonary disease (COPD) and rheumatoid arthritis.  Tr. 15.

4.      None of the impairments meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 18.

5.      The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that the claimant must avoid concentrated exposure to extreme heat, extreme cold and pulmonary irritants.  Tr. 19.

6.      The claimant is capable of performing past relevant work as supervisor, motor vehicle assembly and insertion machine tender.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  Tr. 22.

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7.    The claimant has not been under a disability, as defined in the Social
Security Act, from September 1, 2012, through the date of this decision.
Tr. 23.

## V. Plaintiff's Arguments

Williams challenges the ALJ's decision on three grounds: the ALJ failed to provide good reasons when discrediting the opinion of Dr. Ramsay, her treating source; the ALJ improperly classified Williams' fibromyalgia as not a medically determinable impairment; and the ALJ failed to properly account for Williams' severe mental impairments.  Doc. 12, p. 2.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not violate the treating physician rule

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §

404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Williams argues that the ALJ violated the treating physician rule with respect to Dr. Ramsay's opinion.  The ALJ considered Dr. Ramsay's opinion as follows:

> In January 2017, Dr. Ramsay opined that the claimant could only lift 10 pounds rarely, needed a work break for 10 minutes every hour, had postural and manipulative limitations, and was unable to complete an 8 hour workday (Exhibit 33F).  This opinion was based on the functional capacity evaluation by Mr. Reed that included no validity testing.  Moreover, Dr. Ramsey's progress notes in Exhibit 21F include no description of the claimant's complaints as to her symptoms.  He diagnosed her with fibromyalgia, but there is no tender point analysis.  As to COPD, which the claimant testified was her most serious impairment, his notes consistently show normal respiratory physical exams.  Therefore, I give this opinion little weight.

Tr. 21.  The ALJ also considered physical therapist Reed's opinion:

> In December 2016, David Reed, a physical therapist, opined that the claimant could lift a maximum of 10 pounds, sit constantly, stand or walk occasionally and had multiple postural limitations (Exhibits 29F and 34F).  The exam provided no validity testing and is inconsistent with capabilities suggested by consultative examiners.  Therefore, I give this opinion little weight.

Tr. 21.[3]

Williams argues that the ALJ's assertion that Dr. Ramsay's opinion was based on Reed's evaluation is not supported by the evidence.  Doc. 12, p. 8; Doc. 15, p. 2.  The undersigned

---

[3] Williams does not refer to Reed's evaluation, instead calling it Nurse Dailey's evaluation.  E.g., Doc. 12, pp. 9-10.  But the record shows that Reed performed the evaluation at the request of Dailey.  Tr. 1565-1566.  Williams does not challenge the ALJ's finding that Reed provided the functional capacity evaluation.

disagrees.  Dr. Ramsay's opinion, dated a few weeks after Reed's, repeatedly stated that her answers were based on the "FC."  See Tr. 1589 ("Unknown FC did not address"; "Per FC limited because of breathing"; "Unknown unless FC addressed").  Clearly, in her answers to these questions, Dr. Ramsay was relying on some other document.  "FC" is known as "functional capacity" and Reed, about three weeks prior, had provided a functional capacity evaluation. Moreover, Reed's functional capacity evaluation is consistent with Dr. Ramsay's answers.  For example, Reed opined that Williams could lift 10 pounds rarely due to shortness of breath (Tr. 1565); Dr. Ramsay stated that Williams could lift 10 pounds rarely "per FC" due to shortness of breath.  Dr. Ramsay, who saw Williams for rheumatoid arthritis and fibromyalgia, had not assessed Williams with COPD.  See Tr. 1279-1298 (Dr. Ramsay's treatment notes); Tr. 1589 (Dr. Ramsay's opinion listing Williams' diagnoses as sero and rheumatoid arthritis, fibromyalgia and osteoarthritis).  In sum, substantial evidence supports the ALJ's finding that Dr. Ramsay relied on Reed's functional capacity evaluation in her opinion.

The ALJ gave "little" weight to Reed's opinion, a finding that Williams does not challenge.  Dr. Ramsay's reliance upon Reed's evaluation is an appropriate reason for the ALJ to discredit Dr. Ramsay's opinion.  *See Wilson*, 378 F.3d at 544 (the ALJ considers whether a treating source opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record).

Williams argues that Dr. Ramsay's opinion is consistent with the opinion of consultative examiner Dr. Onamusi (Doc. 12, p. 10), but the ALJ gave Dr. Onamusi's opinion only partial weight (Tr. 20), which Williams does not challenge.[4]  Williams lists her symptoms and

---

[4]  Williams characterizes Dr. Onamusi as finding that Williams could sit for 2 hours, stand for 30 minutes, walk 1-2 blocks and lift 10 pounds.  Doc. 12, p. 10.  But Dr. Onamusi did not opine that Williams would be so limited; these limitations reflect what Williams told Dr. Onamusi she could do. See Tr. 1052.  Dr. Onamusi opined that Williams could perform "light" work as defined in the DOT (Tr. 1053), i.e., lifting no more than 20 pounds at a time with

diagnoses in support of her argument that the ALJ's decision with respect to Dr. Ramsay's opinion is not supported by substantial evidence; but the question is not whether there is evidence is in the record that could support a contrary opinion, the question is whether there is evidence in the record that supports the ALJ's decision. *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion .... This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference[,]" quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).

Williams argues that the ALJ did not provide "good reasons" or discuss the factors required by the regulations when weighing Dr. Ramsay's opinion.  Doc. 12, p. 10.  Again, the undersigned disagrees.  First, an ALJ must consider the enumerated factors in 20 C.F.R. § 416.927(c); he is not required to provide "an exhaustive factor-by-factor analysis."  *Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x 802, 804 (6th Cir. 2011).  Next, the ALJ did provide good reasons and discuss the factors.  The ALJ acknowledged that Dr. Ramsay was Williams' internist who began treating Williams in July 2015.  Tr. 16; 20 C.F.R. § 416.927(c) (the ALJ considers the length of the treatment relationship and the specialization of the physician). He explained that Dr. Ramsay's opinion was based on Reed's evaluation and that her opinion was not supported by her own treatment notes.  *Id.* (the ALJ considers the supportability of the opinion; "the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions.").

---

frequent lifting or carrying of objects weighing up to 10 pounds and performing a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. § 416.967 (defining light work and explaining that the meaning is the same as the DOT).

The ALJ did not violate the treating physician rule.

**B. The ALJ did not err with respect to Williams' fibromyalgia**

Williams argues that the ALJ erred when he found that fibromyalgia was not a medically determinable impairment.  Doc. 12, p. 12.  She asserts that the ALJ's stated reason—the evidence did not show the required location and number of tender points documented by examining physicians—is an inaccurate interpretation of the regulations.  Doc. 12, p. 13.

The ALJ cited the two groups of criteria in SSR 12-2p used to determine whether a claimant's fibromyalgia is a medically determinable impairment: (1) a history of widespread pain, at least 11 positive tender points on physical exam, and evidence that other disorders that could cause the pain must be excluded; or (2) a history of widespread pain, repeat manifestations of six or more symptoms, and evidence that other disorders that could cause the pain must be excluded.  Tr. 18; *see also* SSR 12-2p, 2012 WL 2104869, at *2-3.  The ALJ stated that Williams did not establish the criteria and that the medical evidence did not indicate the required location and number of tender points upon exam.  Tr. 18.

Williams does not appear to contest that the evidence does not indicate the required location and number of tender points, i.e., criteria (1).  Instead, she asserts that the evidence shows criteria (2); that she "has suffered six or more symptoms, signs or co-occurring conditions" and lists them: nausea, irritable bowel syndrome, weakness, fatigue, tiredness and insomnia, headaches, dizziness, numbness/tingling, shortness of breath, tender points, depression and anxiety, and memory problems.  Doc. 12, pp. 14-15 (string citing 30 pages of the transcript without identifying the nature of the record cited or the portion of the record she relies upon).  She also states that she has undergone diagnostic testing that has excluded other disorders.  Doc. 12, p. 15.

As an initial matter, in the fact section of her brief, Williams simply lists symptoms and string cites to the same 30 pages. See Doc. 12, pp. 4-5 (listing 12 symptoms and string citing 30 medical records without further identification/explanation). She does not state which portion of any of the 30 pages of medical records she cites to are the relevant portion of those records.

Most, if not all, of Williams' cited symptoms have roots in other conditions she has been diagnosed with. Williams complains of shortness of breath; she has been diagnosed with COPD and the ALJ found her COPD to be a severe impairment. She also smoked cigarettes for 30-40 years (Tr. 1560) and continues to smoke cigarettes. This is evidence of another disorder that causes shortness of breath and fatigue. Similarly, Williams has been diagnosed with rheumatoid arthritis, which the ALJ found to be a severe impairment. Tr. 15. This, too, is evidence of another disorder that causes pain, fatigue and depression.

Four of the records Williams cites show that Williams complained of dizziness and edema while hospitalized in December 2013. Doc. 12, p. 15 (citing Page ID# 879, 897, 899, 905; Tr. 820, 838, 840, 846).[5] But Williams was found at that visit to have a severe TSH elevation and was admitted. She had not been taking her diabetes or thyroid medications in months. She was diagnosed with hypothyroidism and placed on thyroid medication which helped with her symptoms and her thinking/memory issues improved. Tr. 938. This is evidence of hypothyroidism, another disorder that causes dizziness, edema, thinking/memory problems, and fatigue. See Tr. 15 (ALJ detailing Williams' hospitalization and her diagnosis of hypothyroidism). Williams occasionally endorsed tingling and numbness in her feet; nine records cited by Williams are visits to Dr. Gray, her podiatrist, whom Williams saw for diabetes mellitus foot exams. Tr. 1166. Moreover, Williams even testified, upon her attorney's questioning, that her diabetes causes dizziness, numbness, tingling, and nerve pain. Tr. 538.

---

[5]  In her brief, Williams cites to the Page ID# rather than the transcript number.

This is evidence of diabetes, another disorder that causes tingling, numbness and pain in her feet and fatigue.  See Tr. 17 (ALJ remarking that Williams' diabetes was well controlled with medication).  Williams has also been diagnosed with chronic kidney disease, of which many of Williams' listed complaints are symptoms.  Tr. 16 (ALJ explaining that Williams saw Dr. Muddada for treatment of her chronic kidney disease).  In short, Williams does not show that she experienced repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions and that other disorders that could cause these repeated signs, symptoms or conditions were excluded.  *See* SSR 12-2p; *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (2003) (claimant bears the burden at steps one through four).

Williams states that she has "undergone objective testing and treatments to exclude other disorders[.]"  Doc. 12, p. 15.  She cites Tr. 794 and 1132 (Page ID# 853 and 1191), duplicate Lumbar x-ray reports showing degenerative changes most prominent at the L5-S1 level.  This x-ray does not exclude another disorder; it indicates a disorder, i.e., degenerative disc disease.  She cites Tr. 801 (Page ID#860) which is a record showing that when Williams arrived for a pulmonary function study the test could not be performed due to the fact that she was struggling to breathe, and Tr. 812 (Page ID# 871) a pulmonary function study that indicated non-reproducible tracings, was not valid, and also indicated a moderate obstruction.  These records do not exclude another disorder.  She cites Tr. 822 (Page ID#881), a record indicating she had a normal EKG, and Tr. 836 (Page ID# 895), a subsequent record showing that a stress test was normal and acute coronary syndrome had been ruled out; it is unclear what symptom Williams believes these records are relevant to and she does not say.  She cites Tr. 1019 (Page ID#1078), a chest x-ray, which showed that she had a mildly enlarged heart and hyperinflation of her lungs, a common COPD symptom.  This is not a record that excludes another disorder.  She cites Tr.

1036 (Page ID#1095) without explaining why; the record is a treatment note from Nurse Dailey and appears to suggest that a cardiology workup was negative and that Williams had not had a colonoscopy in the last five years.  She cites Tr. 1143 (Page ID#1203), a CT of her abdomen/pelvis which showed a lesion on her right kidney that had increased in size in comparison to the last scan, mild atherosclerosis (narrowing of the arteries), and mild diverticulosis of the colon.  Again, not a record that excludes a disorder other than fibromyalgia. Lastly, Williams cites Tr. 1148 (Page ID# 1207), an MRI of her left ankle showing a cyst, which was removed by Dr. Gray.  None of these records support Williams' assertion that evidence in the record excludes other disorders and that she met the fibromyalgia criteria set forth in SSR 12-2p.

Williams asserts that the ALJ overlooked evidence in the record that supports the severity of her fibromyalgia and "led to a complete failure to consider all of [her] medical impairments and all of her limitations."  Doc. 12, p. 12.  Williams does not spell out precisely what record evidence the ALJ allegedly overlooked beyond string citing 19 pages of records, some duplicative of those cited above.  Doc. 12, p. 14.  Moreover, the ALJ detailed Williams' complaints, symptoms, and diagnoses, including her COPD, rheumatoid arthritis, hypertension, diabetes, depression, affective disorder, pain, gastrointestinal issues, hypothyroidism, chronic kidney disease, arthritis in her right shoulder, history of carpal tunnel syndrome, obesity, fibromyalgia, and substance addiction disorder.  Tr. 15-18.

Finally, Williams argues that the ALJ erred when he did not consider whether her fibromyalgia met or equaled a listing.  Doc. 12, p. 16.  There is no listing for fibromyalgia, however.  SSR 12-2p, 2012 WL 3104869, at *6 ("[Fibromyalgia] cannot meet a listing in appendix 1 because [it] is not a listed impairment.").  And Williams has not presented argument,

or evidence, showing that her condition medically equals a listing.  *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." (emphasis in original)).  The ALJ did not err with respect to Williams' fibromyalgia.

### C. The ALJ did not err when finding that Williams' depression was not a severe impairment

Williams argues that the ALJ erred when he found that her depression and anxiety were not severe impairments.  Doc. 12, p. 17.  She also states that the ALJ has a duty to consider non-severe impairments when assessing a claimant's RFC and that the ALJ "simply disregarded [her] mental limitations after determining that they were non-severe."  Doc. 12, p. 19.

The ALJ expressly considered Williams' mental impairments when assessing her RFC (Tr. 20-21), so the ALJ's failure to classify Williams' mental impairment as "severe" at step two is not reversible error.  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Fisk v. Astrue*, 253 Fed. App'x 580, 583-584 (6th Cir. 2007) ("When an ALJ determines that one or more impairments is severe, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe ... an ALJ's failure to find additional severe impairments at step two does not constitute reversible error," quoting SSR 96–8p, 1996 WL 374184, at *5; *Maziarz*, 837 F.2d at 244); *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 577 (6th Cir. 2009); *Kirkland v. Comm'r of Soc.*

*Sec.*, 528 Fed. App'x 425, 427 (6th Cir. 2013).  Thus, the ALJ did not "simply disregard[]" Williams' mental impairments, as she alleges.

Williams does not articulate a challenge to the ALJ's findings related to her mental impairments, other than to generally state that her mental impairments "clearly affect her ability to perform substantial gainful activity on a sustained basis."  Doc. 12, p. 19.  The ALJ disagreed. Other than string citing pages of the transcript she believes shows her severe symptoms (Doc. 12, p. 17),[6] she does not challenge the ALJ's findings and has waived any purported specific challenge to the ALJ's findings regarding her mental impairments.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

---

[6]  Moreover, some of Williams' citations are not relevant.  For example, she cites Page ID#851 (Tr. 792) which does not document any current or past mental health impairments.  Page ID# 901 (Tr. 842) shows reported memory problems when Williams visited the emergency room and was admitted for having a severely high TSH level and admitting she had not been taking her hypothyroid medication; her memory improved once the hospital administered her medication.  Other citations (e.g., Page ID#1096 (Tr. 1037), Page ID#1256 (Tr. 1197)) denote Williams had been diagnosed with depression, an issue that is not in dispute.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: December 6, 2018

/s/ Kathleen B. Burke
_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).